UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS DALLAS
DIVISION

| | | |
|---|---|---|
| ALAN D. HALPERIN, <br>   as Unsecured Creditor Trustee, <br><br>   Plaintiff, <br><br> v. <br><br><br> ERIC WILLS, as Trustee of THE WILLS REVOCABLE LIVING TRUST and ERJMJ INVESTMENTS, LP, <br><br>   Defendants. | § § § § § § § § § § § § § § | CIVIL ACTION NO. 3:21-CV-1498-B <br> (Bankr. Case No. 18-33967-sgj11) <br> 18-33967-sgj11)) <br> (Adv. No. 20-03178-sgj) |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Eric Wills, as trustee of the Wills Revocable Living Trust, (the "Wills Trust")'s Limited Objection to the Bankruptcy Court's Report and Recommendation to the District Court ("Objection") (Doc. 9). For the reasons stated below, the Objection is **OVERRULED,** and the Report & Recommendation is **ADOPTED**.

The above-referenced adversary proceeding ("Action") is an ancillary proceeding to the Chapter 11 bankruptcy case ("Bankruptcy Case") of Debtor Senior Care Centers, LLC ("SCC"). The relevant facts are as follows. In October 2017, SCC's parent company, Granite Investment Group, LLC ("Granite"), borrowed money through several bridge loans. Doc. 8-1, R. & R., 18–19.[1] Granite backed each of these bridge loans with the same collateral. *See id.* at 19. Granite was the listed borrower of the

---

[1] The Court refers to the undisputed facts as presented in the Report and Recommendation, none of which the Wills Trust disputes in its Objection. 28 U.S.C. § 157(c) ("[R]eviewing de novo those matters to which any party has timely and specifically objected."); FED. R. BANKR. P. 9033.

loans, but the funds were actually "sent directly by the [lenders] to an SCC account, then SCC used the funds to pay operating expenses." *Id.* at 4. Three months later, in December 2017, Granite borrowed money from the Wills Trust through a short-term bridge loan (the "Bridge Loan") that, like the other bridge loans, was also intended for SCC. *Id.* at 3. At the time, the Wills Trust was the largest investor of SCC in terms of dollars invested, its controller, Eric Wills, separately invested in another equity offering by SCC and he "was a significant investor in . . . Granite Landlords that leased nursing home facilities to SCC." *Id.* at 16–17, 57–58.

Of the bridge loans Granite obtained for SCC in October and December 2017, the Bridge Loan represented the largest loan amount. *Id.* at 19. For the Bridge Loan, the Wills Trust was able to secure "different collateral" than the collateral offered to the October lenders. Doc 8-1, R. & R., 19–20. Essentially, the Wills Trust's collateral was Granite's "50% membership interest" in a Delaware limited liability company. *Id.* at 20. The express purpose of the October bridge loans and the Bridge Loan "was to . . . provide immediately needed working capital to SCC." *Id.* at 3, 37, 44–45. Such working capital was "needed . . . to pay for [SCC's] ongoing operations pending an anticipated sale of certain of its pharmacy assets ('Pharmacy Sale'), which sale was being pursued by SCC to address its liquidity needs." *Id.* at 4. SCC and Granite executed promissory notes recording the fact that Granite's bridge loan debt was SCC's responsibility. *Id.* at 20–23. After selling some of its assets in the Pharmacy Sale, SCC paid the Wills Trust back directly for the Bridge Loan in February 2018. *Id.* However, approximately two months later in April 2018, Granite circulated a promissory note between it and SCC that amended the maturity date of the Bridge Loan. *Id.* at 22. Approximately nine months after SCC repaid the Bridge Loan, it filed for bankruptcy. *Id.* at 4.

Plaintiff Alan D. Halperin is the trustee in the Bankruptcy Case. He represents the interests of SCC's unsecured creditors. Halperin initiated this Action against the Wills Trust to "avoid and recover" SCC's re-payment of the Bridge Loan to the Wills Trust. *Id.* at 2. This Court ordered the Action to be referred to the Bankruptcy Court for all pretrial matters, including dispositive motions. *See* Doc. 4, Order. The Wills Trust moved for summary judgment as to each of the Halperin's claims. *See generally* Doc. 7-1, Mot. Summ. J. Relevant to this Opinion are Halperin's insider preference claims arising under Bankruptcy Code §§ 544(b), 547, and 550, and Texas Business and Commerce Code ("TUFTA") § 24.006(b) (collectively, "Insider Preference Claims"). *See id.* at 9–10. The Insider Preference Claims encompass Halperin's contention that the Bridge Loan between the Wills Trust and Granite, and in effect SCC, was a result of the Wills Trust's advantageous, insider relationship with SCC. Before the Bankruptcy Court, the Wills Trust argued there is no evidence it was "an insider of [SCC] at the time of the [Bridge Loan]," and therefore, it was entitled to summary judgment on the Insider Preference Claims. *Id.* at 2.

In its Report and Recommendation ("R. & R."), the Bankruptcy Court recommends denying summary judgment on the Insider Preference Claims because "the Wills Trust has not met its burden of showing there do not exist genuine issues of material fact." Doc. 8-1, R. & R., 75. The Wills Trust objects only "to the recommendation that the District Court deny summary judgment in favor of Wills Trust on the [Insider Preference Claims]." Doc. 9-1, Obj. 4. The Wills Trust challenges the Bankruptcy Court's analysis of a necessary element of the Insider Preference Claims—whether the Wills Trust was a non-statutory insider. *See id.* at 8. First, the Wills Trust argues that the Bankruptcy Court blended a two-factor legal test into one interrelated question. *Id.* at 5. Second, the Wills Trust contends that the

Bankruptcy Court improperly concluded the test's second factor raises material fact issues. *Id.* at 5–6.

The Court conducts a *de novo* review of the R. & R.'s proposed findings and conclusions that pertain to the Objection. 28 U.S.C. § 157(c); FED. R. BANKR. P. 9033. The Fifth Circuit has adopted "two factors" for determining whether a creditor is a non-statutory insider, which derive from the Ninth Circuit and out-of-circuit district courts. *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992). These two factors ask (1) whether the creditor has a close relationship with the debtor and (2) whether their transaction was made at arm's length. *Id.* The Wills Trust argues it is not a non-statutory insider to SCC because there is no evidence that either factor is satisfied as applied to the Bridge Loan.

The Objection begins with the argument that the Bankruptcy Court applied the wrong legal test. The R. & R. identifies the same two factors for its non-statutory insider analysis as the Wills Trust has pointed to in the Objection. Doc. 8-1, R. & R., 54–56; Doc. 9-1, Obj., 6. The Wills Trust argues that the Bankruptcy Court erroneously applied the two-factor analysis as a disjunctive rather than a conjunctive test. Doc. 9-1, Mot., 8–11. In the seminal case, *In re Holloway*, the Fifth Circuit considered each factor without expressly defining its analysis as conjunctive or disjunctive. 955 F.2d at 1011–14. Notably, *In re Holloway* addressed only a claim under TUFTA § 24.006(b), *see id.* at 1009, whereas Halperin has also brought insider preference claims under the Bankruptcy Code.[2]

What appears to be the Wills Trust's true qualm is that the R. & R. treats the closeness factor as interrelated with the arm's length factor, rather than treating the two factors as entirely distinct. Doc. 9-1, Obj., 6 ("[T]he Bankruptcy Court did not independently analyze the 'arm's length' nature of the underlying loan"). While the *In re Hollaway* court looked to each factor separately, 955 F.2d at

---

[2] The Wills Trust does not raise another applicable test for its claims under the Bankruptcy Code, nor has the Court found one.

1011–14, it also cited the legislative history of 11 U.S.C. § 101(31), which defines an insider as "a person or entity with 'a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.'" *Id.* at 1010–11.

Upon its review of the caselaw in this Circuit, the Court has found courts' application of the two-factor test to vary. Some courts have analyzed the two factors as interrelated, while other courts treat the factors as more distinct. *Compare, e.g.*, *In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 433 (Bankr. N.D. Tex. 2021) (concluding party's closeness enabled control in sales process and such control rendered an escrow transfer "not made in arm's length") *and PDVSA Petroleo S.A. v. Trigeant, Ltd.*, No. CIV.A. C-09-38, 2012 WL 3249531, at *11 (S.D. Tex. Aug. 7, 2012) (looking at arm's length nature of transaction in light of party's affiliation and relatedness to debtor) *with In re Think3, Inc.*, 529 B.R. 147, 190 (Bankr. W.D. Tex. 2015) (same).

Indeed, the Wills Trust's summary judgment brief to the Bankruptcy Court and its Objection cite to case law recognizing the interplay between the two non-statutory insider factors. *See* Doc. 7-2, Br. Mot. Summ. J., 26 ("In the Fifth Circuit, non-statutory insider status is *reached only when* a transferee has a *sufficiently close relationship* with a debtor, based on control or influence over the debtor, *that any dealings between the debtor and the transferee are not at arm's length.*" (emphasis added)); Doc. 9-1, Obj., 6 (citing *In re Olmos Equipment, Inc.*, 601 B.R. 412, 426 (Bankr. W.D. Tex. 2019) ("Plaintiff has not shown that DCM had a sufficiently close relationship with OEI or that DCM exercised control or influence over the Debtor such that the transaction at issue was not done at arm's length.")).

Assuming, *arguendo,* that the two factors require distinct analyses, the undisputed evidence raises genuine issues of material fact as to the arm's length inquiry. *See e.g.*, Doc. 8-1, R. & R., 57–58;

*cf.* Doc. 9-1, Obj., 6. The Court begins with the arm's length factor, which is the Objection's primary target. The Wills Trust was the largest bridge loan lender to SCC, via Granite, but the Bridge Loan was made in response to two troubling realities: SCC needed capital to remain afloat until the Pharmacy Sale and such a need came after SCC had already obtained a series of bridge loans a few months earlier. *See id.* at 16–19. The Wills Trust "was able to negotiate a different collateral package" for the Bridge Loan than the collateral obtained by the October 2017 bridge lenders.[3] *See id.*; *In re Top Hat 430, Inc.*, 557 B.R. 744, 753 (Bankr. D. Minn. 2016), *aff'd*, 568 B.R. 314 (B.A.P. 8th Cir. 2017) (considering whether loan was secured, differential treatment toward a creditor, and whether transaction was mutually beneficial to parties when evaluating arm's length factor). But there is no evidence that the Wills Trust had a higher priority than other bridge lenders for the "different collateral package." A reasonable inference from the record is that the Wills Trust required "different collateral" than the other bridge lenders because SCC's need for more operating capital was more dire by December 2017. A reasonable juror could also conclude the "different collateral package" was more beneficial to the Wills Trust and less advantageous to SCC and Granite given SCC's needs at the time. *See id.* at 19; *In re Top Hat 430, Inc.*, 557 B.R. at 753. Indeed, it was only after the Pharmacy Sale that SCC was able to pay back the Bridge Loan. Doc. 8-1, R. & R., 20–23.

Another question pertinent to whether the Bridge Loan was made at arm's length is whether the Wills Trust knew about the SCC's creditworthiness or insolvency. *See In re Top Hat 430, Inc.*, 557

---

[3] The Wills Trust argues its different collateral package is "irrelevant" to an analysis of its relationship with SCC because Granite pledged the different collateral, not SCC. Doc. 9-1, Obj., 10. Regardless of who pledged the collateral for the Bridge Loan, as a loan term, the collateral is pertinent to the arm's length inquiry.

B.R. at 753; *In re Think3*, 529 B.R. at 190 (considering creditor's knowledge of insolvency as relevant to arms-length inquiry). The record evidence suggests the Wills Trust would have known about SCC's insolvency. Doc. 8-1, R. & R., 19–22. The Wills Trust became "the largest Bridge Lender," knowing that the Bridge Loan "was to . . . provide immediately needed working capital to SCC." *Id.* at 3. The Bridge Loan was expected to be paid back from SCC's sale of its assets in the Pharmacy Sale rather than from internal improvements. *Id.* at 4. Moreover, the Bridge Loan was secured *three months after* SCC's October funding, which means SCC had ongoing liquidity needs for its operations prior to closing the Pharmacy Sale. *See id.* 3–4, 33, 57. A reasonable juror could conclude that SCC's again requiring a large injection of capital prior to the Pharmacy Deal was a red flag illustrating internal mismanagement of the October bridge loan funds and insolvency if the Pharmacy Sale did not close. *See id.* 57. Nine months after SCC paid back the Bridge Loan, it filed for bankruptcy. *Id.* at 4, 24. The timing and the purpose of the Bridge Loan, as well as the Bridge Loan's temporal proximity to SCC's Chapter 11 filing, permit a reasonable inference that the Wills Trust knew SCC was insolvent or soon to be insolvent when it agreed to fund the Bridge Loan. *See id.* at 3–4, 20, 57; *In re Think3*, 529 B.R. at 190.

Another consideration—whether there exists formal, contemporaneous documentation for the Bridge Loan—also raises material fact questions. *See* Doc. 8-1, R. & R., 21–22; *see In re Torpey*, 458 F. Supp. 3d 648, 656 (E.D. Mich. 2020) (listing "formalities, such as written documentation, promissory notes, and recorded security agreements" as relevant to arm's length analysis); *see also In re Top Hat 430, Inc.*, 557 B.R. at 753. The record is unclear when any of the promissory notes related to the Bridge Loan were signed, or if there was documentation executed at the time its funds were transmitted. Doc.

8-1, R. & R., 19–22. The Court also finds the amended note between SCC and Granite in April 2018 to be irregular because it *extended* the Bridge Loan's maturity date two months *after* SCC apparently paid the Bridge Loan. *Id.* at 22–23. The lack of formal documentation around the Bridge Loan and subsequent irregular documentation raises more uncertainty about the Bridge Loan's arm's length nature, and further supports the ultimate recommendation that there exist genuine issues of material fact as to the insider inquiry. While there are other facets of the Bridge Loan transaction the Court could consider, *see, e.g.*, *In re Think3*, 529 B.R. at 190, the Court finds the foregoing evidence sufficient to support the existence of a genuine issue of material fact as to the arm's length factor.

The Objection to the R. & R. with respect to the closeness factor also fails. Doc. 9-1, Obj., 12–14. The Court finds the undisputed facts to raise genuine issues about how close the Wills Trust was to SCC. *See* Doc. 8-1, R. & R., 57–58. Particularly persuasive is that "the Wills Trust was the largest investor of SCC in terms of dollars invested," its controller, Eric Wills separately invested in another equity offering by SCC and he "was a significant investor in . . . Granite Landlords that leased nursing home facilities *to SCC*." *Id.* (emphasis added).

For the foregoing reasons, the Court **OVERRULES** the Wills Trust's Objection and **ADOPTS** the R. & R. The Wills Trust's Motion for Summary Judgment as to the Insider Preference Claims is **DENIED**.

**SO ORDERED.**

**SIGNED: August 13, 2024.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE